# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| Mr. and MRS. DOE, individually and as parents and next friends of JANE DOE, a minor, | ) ) ) | |
| Plaintiff | ) | |
| v. | ) | No. 2:18-CV-00259-LEW |
| | ) | |
| CAPE ELIZABETH SCHOOL DEPARTMENT, | ) ) | |
| Defendant | ) | |

## <u>MEMORANDUM DECISION AND ORDER</u>

Plaintiffs Mr. and Mrs. Doe, individually and as parents and legal guardians of Jane Doe, appeal from a decision of the Maine Department of Education ("MDOE") issued pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, and Maine's laws regarding education of exceptional students, 20-A M.R.S. §§ 7001 *et seq.* At the close of the Department of Education Due Process Hearing, the hearing officer found in favor of the Defendant, Cape Elizabeth School Department, and denied Plaintiffs' request for reimbursement of the costs associated with Plaintiffs' unilateral placement of Jane at two out-of-state private educational and therapeutic institutions. Following a review of the administrative record and after receiving argument from the parties in a hearing held on March 5, 2019, I **AFFIRM** the judgment of the hearing officer for the reasons discussed below.

## STATUTORY BACKDROP

The aim of the IDEA is to "ensure that all children with disabilities have available to them a free appropriate public education" that provides "special education and related services" tailored to the "unique needs" of the individual child and designed to "prepare [the child] for further education, employment, and independent living." 20 U.S.C. §§ 1400(d)(1)(A), 1401(9); *see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 203 (1982) ("Insofar as a State is required to provide a handicapped child with a 'free appropriate public education,' we hold that it satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."). Maine education law is to the same effect and empowers the Maine State Board of Education to "formulate[] policy and enforce[] the regulatory requirements of school administrative units." *Goodwin v. School Admin. Dist. No. 35*, 721 A.2d 642, 645 (Me. 1998); 20-A M.R.S. §§ 401-A (empowering the Board to enforce regulatory requirements), 7201 ("All students must be provided with equal educational opportunities and all school administrative units shall provide equal educational opportunities for all children with disabilities."), 7204 (providing that the state plan for education of students with disabilities "may not require services that exceed minimum federal requirements").

To ensure that every disabled student receives a free appropriate public education ("FAPE"), state and federal laws require schools to identify children who qualify as disabled or who the schools reasonably suspect may qualify as disabled, experience adversity in educational performance due to their disability, and "need special education

and related services by reason of the disability." *Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 13-14 (1st Cir. 2007). When these circumstances are evident with respect to a particular child, a school must evaluate the child to determine if the child is eligible for statutory benefits, and, if so, develop a customized individual education plan ("IEP") designed to provide the child with a "level of educational benefits commensurate with a FAPE." *C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 285 (1st Cir. 2008).

If a family believes the school has failed to identify a child as qualifying for special education services or is otherwise failing to provide a FAPE and those concerns are not resolved by the school, the parents or guardians may request an impartial due process hearing before a hearing officer acting on behalf of the state educational agency. 20 U.S.C. § 1415(f)(1)(A); 20-A M.R.S. § 7207-B.[1] Families or school districts "aggrieved by the findings and decision" of the hearing officer may challenge the same in state superior court or federal district court. 20 U.S.C. § 1415(i)(2)(A); 20-A M.R.S. § 7207-B(2)(B).

## BACKGROUND

Jane Doe attended Cape Elizabeth schools from kindergarten into her eleventh-grade year.[2] Jane attended school on a consistent basis and was a strong student, but as reported by her parents, began to display oppositional behaviors including "behavioral outbursts and defiance" when she was four or five years old. *R.* 2627, 2677. Her father

---

[1] Mediation is also an option. 20-A M.R.S. § 7207-C.

[2] Jane is now 18 years old and received her high school diploma from Stansbury Academy in Sandy, Utah, on January 23, 2018. Compl. ¶ 8; Pl. Memo ¶ 2 (ECF No. 15, #58); *R.* 326.

reported that the frequency of these volatile behaviors "intensified since [Jane] hit puberty." *Id.* at 2677.

## I. NINTH GRADE (2014-2015)

During her ninth-grade year at Cape Elizabeth High School ("CEHS"), Jane performed well academically – she enrolled in many honors classes and earned an unweighted grade point average ("GPA") of 91.85. *R.* 889. In addition to her coursework, Jane participated in the school swim team, tennis team, and chess club. *R.* 890. Her guidance counselor and parents reported no disciplinary problems at school. *R.* 890, 2629.

In contrast to her academic success, her parents reported an uptick in "behavioral outbursts and . . . escalating behaviors" at home. *R.* 2488. In a progress note, one of Jane's treating physicians noted that the Does indicated that Jane experienced "extreme fluctuations in mood" and had even made threats to run away from home or call the Cape Elizabeth police on the Does. *Id.* On January 26, 2015, the Does requested a crisis assessment at Sweetser[3] due to Jane's reported "increasing irritability, oppositional behaviors and moodiness" in relation to her refusal to fill out an application for boarding school. *R.* 2627. The crisis assessment evaluator indicated Jane "presents as cooperative and friendly" and recorded Jane's statements that "she does not fit in with her family," but also noted a "history of poor social skills, low tolerance for frustration, impulsivity and verbal aggression toward others." *Id.* The evaluator concluded Jane was "not unsafe at

---

[3] Sweetser is a "mental health and behavioral health organization with offices throughout Maine." Def.'s Mem., 3 n.3 (ECF No. 19, #100).

home and [did] not need a higher level of care." *Id.* Jane was not admitted following the crisis assessment. *Id*.

Near the end of ninth-grade, the Does enrolled Jane as a residential student at the Hyde School in Bath, Maine, but removed her after about six weeks because the school did not meet the Doe's expectations regarding discipline. *R*. 3167.

Jane returned to CEHS and finished her ninth-grade year with significant academic success. *R*. 889, 3167. At the close of the year, Jane had been absent only once (other than her time spent at Hyde), tardy without excuse twice, and dismissed early seven times for various reasons ranging from doctors' appointments to "tour." *Id.* at 1090, 2168-69.

## II.  TENTH GRADE (2015-2016)

Jane's academic achievements continued through her tenth-grade year. She once again enrolled in various honors classes as well as one Advanced Placement statistics class. *R*. 904. At the close of her tenth-grade year, she earned an unweighted GPA of 89.32. *R*. 904, 1058. As in her freshman year, Jane's teachers reported that she was a pleasant and hardworking pupil. *R*. 4312, 4314.

However, Jane's relationship and interactions with her parents became more tumultuous during her tenth-grade year. During the 2015-2016 school year alone, the Does (and once, Jane) called the Cape Elizabeth Police on four occasions, *R*. 2881, 2883, 2886, 2888, and Jane underwent five crisis assessment evaluations at Sweetser. *R*. 2632, 2638, 2643, 2669, 2677. In response to these familial tensions, Jane began meeting with Elizabeth Murphy-Lewis, a school social worker at CEHS, *R*. 1213; 3894, and the Doe family began meeting with a family therapist, Tom Fitzgerald. *R*. 2405.

On multiple occasions, Jane's parents sought to have Jane "placed in a facility," but medical practitioners repeatedly determined that Jane did not meet the criteria for hospitalization.  *R.* 2424; *see also R.* 2638 (indicating that after conducting a crisis assessment, a Sweetser caseworker concluded that Jane met "all criteria to remain home with her parents"); 2884-85 (recording that when a Sweetser caseworker told the Does that "she did not feel that [Jane] met the criteria for an emergency admission," the Does "became upset and told [the caseworker] that they just can't handle [Jane] anymore"); 2886, 895 (recording that the Does told responding officers that they "wanted their daughter taken somewhere" although Jane was later determined to not meet the criteria for hospitalization); 2675, 2889-90 (recording that after Jane returned unexpectedly from staying at a friend's house, the Does called the police, Ms. Doe insisting that they "wanted [Jane] removed and that she didn't care where she went but that she could not be at their house," ultimately resulting in the police persuading Jane to go to the hospital voluntarily "as the parents were adamant that she go to the hospital immediately," but noting that Jane was not admitted as she was "at low-risk for hurting herself or others").  However, on one occasion, Jane was admitted to a Sweetser Crisis Stabilization Unit in Saco "due to serious family conflict during which she made suicidal statements," but was released after three days. *R.* 2726, 2736, 2871.

The record indicates CEHS was aware of the conflict in the Doe family and provided academic support throughout.  For example, when Jane was admitted to the Saco Crisis Stabilization unit, the Director of School Counseling at CEHS forwarded homework assignments to Sweetser for Jane to complete. *R.* 1210.  On March 14, 2016, Jane's CEHS

teachers were notified via email that "she is having significant personal and family issues at this time that may impact her academics. She will attempt to speak with you on a case by case basis for assignments that are missing or late." *R.* 1222.

In late March 2016, the Does obtained an assessment of Jane from psychologist Dr. Francoise Paradis. *R.* 894. As part of this evaluation, Dr. Paradis interviewed not only Jane, but also Mr. and Mrs. Doe and Jane's CEHS social worker, Ms. Murphy-Lewis. *Id.* Dr. Paradis noted that "[t]he only area of difficulty [Jane] has is within the family" and attributed Jane's negative behaviors "to the pressure she feels from her parents' demands that are in conflict with normal adolescent development as she struggles to form her own identity." *R.* 901-02. In Dr. Paradis's assessment, Jane was a "strong, happy young woman who is having some mild depression and anxiety as a reaction to her home situation." *R.* 902. While Dr. Paradis diagnosed Jane with "Adjustment Disorder with disturbance of mood and conduct" as well as "Generalized Anxiety Disorder," Dr. Paradis noted there was "no evidence of any other mental illness." *Id.* Dr. Paradis summarized her view of the conflict between Jane and her parents: "Her parents seem to have pathologized what in most homes would be considered normal teenage behavior or rebellion." *R.* 901. Mr. Doe testified that this report was not provided to CEHS until February 2017 – nearly one year after it was completed.[4] *R.* 305, 1435.

As the winter semester continued, Jane's teachers and CEHS administrators expressed some concern regarding Jane's academic performance due to her absences. *R.*

---

[4] Plaintiffs characterize Dr. Paradis's evaluation as "flawed" and claim that it contributed to a negative dynamic in the Doe home because it "pitted the Does against each other". Pl.'s Mem. ¶ 8 (ECF No. 15, #59).

1223.  In response to those concerns, Ms. Murphy-Lewis emailed Jane's teachers and requested that Jane be allowed a grace period to improve her grades.  *R.* 1226.  Ms. Murphy-Lewis explained that "[Jane] ha[d] been experiencing a great deal outside of school" and expressed her belief that Jane "would benefit from a bit of flexibility and added support on our part." *Id.*

On May 21, 2016, familial tensions once again erupted, and Jane was admitted to the Sweetser Crisis Stabilization Unit ("CSU") in Saco until May 31, 2016.  *R.* 2758-2813.  CEHS was aware of this absence and Ms. Murphy-Lewis visited Jane in the Saco CSU to discuss the school work Jane was missing and her ability to complete it before the end of the school year.  *R.* 296.  When corresponding with Jane's teachers, Ms. Murphy-Lewis referred to the cause of Jane's absence as "an emergency situation."  *R.* 1238.

Once discharged from Sweetser, Jane lived in a rented home with her aunt.  *R.* 3204.  Jane returned to CEHS and Ms. Murphy-Lewis and Jane's teachers worked with her to complete her tenth-grade year.  *R.* 1237-38.  Jane took her AP statistics exam and passed it.  *R.* 297.

At the close of the year, Jane had 15 excused absences (12 of which were due to "medical conditions" and her placement at Sweetser), 1 unexcused absence, 14 excused tardies, and was dismissed early 10 times.  *R.* 1090, 2169-71.  A review of the school's Daily Attendance Report indicates that the Does reported many of her tardies and dismissals as excused for doctor's appointments.  *R.* 2169-71.

Although the school was aware of the contours of the increasingly volatile atmosphere in the Does' home throughout the school year, the school 'intervention team'[5] "saw no adverse impact at school" and "decided not to refer her for special education." Def.'s Memo. 7 (ECF No. 19, #104); *R.* 4312. Jeffrey Shedd, the principal of CEHS and a member of Jane's 'intervention team' testified: "Our sense at the time was that [Jane's] issues were largely at-home issues. At school she presented throughout her sophomore year as the same very sweet, well-behaved, compliant student that she'd always been." *R.* 4312. Sweetser caseworkers similarly noted that up until this point, "[Jane] ha[d] no [history] of emotional dysregulation or behavioral issues within the school environment" and further noted that the Does "report[ed] that [Jane] has never been in trouble for aggression or violence." *R.* 2697.

## III. ELEVENTH GRADE (2016-2017)

In the summer before eleventh grade, Mr. and Mrs. Doe separated and Mr. Doe moved into a rented home in Cape Elizabeth. *R.* 3199, 3206. Jane moved in with Mr. Doe. *R.* 3206. Jane returned to CEHS for her junior year but began to complain of significant anxiety regarding school attendance. *R.* 2592. On September 8, 2016, she reported to a nurse practitioner at her doctor's office that she felt "a lot of pressure" and "very judged" while at school. *Id.* Jane's attendance at CEHS began to decline and although the clear majority of her absences were excused by the Does, her teachers took note. *R.* 2171-72.

---

[5] The intervention team consisted of the CEHS leadership, including the Principal, the Assistant Principal, the school nurse, two guidance counselors, the school social workers (including Ms. Murphy-Lewis), as well as the special education department chair. *R.* 4340-41. The team met every two weeks to "review students who were of concern." *R.* 41341.

By September 13, 2016 – at which point Jane had been absent two days and dismissed early once – two of Jane's teachers expressed concerns over her absences and "how much [schoolwork] she ha[d] missed already!" *R.* 1247; 2171. On September 15, 2016, another one of Jane's teachers inquired about her absences to CEHS's Director of School Counseling. *R.* 1250.

On September 16, 2016 – just eleven days after school started – Jane was involved in a car accident. *R.* 2582. She was diagnosed with a concussion and was determined to be in the "red zone." *R.* 2583. Jane's doctor ordered her to rest and "not attend school." *Id*. Jane returned to school after a two-day absence due to her concussion, but thereafter was consistently seen in the nurse's office for complaints stemming from the concussion. *R.* 1053. On some days, Jane visited the nurse's office three or four times with physical complaints. *Id*. However, beginning on September 30, 2016, Jane's complaints to the school health office began to transition from concussion-related symptoms to those of "emotional concern." *Id*.

During this time, Jane was referred by her treating physicians to a new psychiatrist, Dr. Bowker-Kinley, due to complaints of anxiety-induced hives. *R.* 2587. On September 19, 2016, Dr. Bowker-Kinley diagnosed Jane with Generalized Anxiety Disorder. *R.* 2585. Ms. Murphy-Lewis was in touch with Dr. Bowker-Kinley and by October 10, 2016, was generally aware of Jane's GAD diagnosis, although she had not received confirmation of a formal diagnosis. *R.* 300, 3979, 3982.

In response to Jane's increasingly common absences and expressions of anxiety, on October 10, 2016, Ms. Murphy-Lewis sent an email to a CEHS social worker stating that

Jane "has been struggling to get to school" and that she wanted to "initiate a 504."[6] *R.*

1258. Up until this point in the schoolyear, Jane had been absent from school seven times,

but only one of those absences had been unexcused. *R.* 2171-72.

On October 10, 2016, Jane reported lingering symptoms from her concussion to her

psychiatrist, Dr. Bowker-Kinley. *R.* 2623. During this same appointment, Jane and her

psychologist discussed Jane's desire to transfer schools, but the psychologist "reiterated . .

. that [she] did not feel leaving the current school district was a good choice, [and] that her

school district is certainly capable of offering her the support and accommodations that she

needs to be successful at school." *R.* 2622. During this appointment, Mr. Doe reported to

Dr. Bowker-Kinley that "concussion and health issues have been driving conflicts around

school attendance." *R.* 2623.

The 504 Determination Meeting[7] was held on November 10, 2016 and was attended

by Mr. and Ms. Doe as well as Ms. Murphy-Lewis, four of Jane's teachers, Jane's guidance

counselor, Principal Shedd, and Assistant Principal Carpenter. *R.* 938. The 504 paperwork

summarized the school's concerns: "[Jane] has been diagnosed with anxiety disorder. She

is under treatment. While academically capable, [Jane]'s condition interferes with her

ability to attend school." *Id.* The team found Jane eligible due to her "anxiety disorder"

and crafted a plan for accommodating her disability under Section 504 of the Rehabilitation

Act of 1973, 29 U.S.C. § 794 ("504 Plan"), an approach that is distinct from the formulation

---

[6] "504" refers to section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

[7] Interestingly, when scheduling this meeting, Ms. Doe indicated that she was "not certain that the 504 is appropriate for [Jane], as she is capable of doing her work in a timely manner but chooses not to." *R.* 935.

of an IEP under the IDEA. *R.* 941-43. The 504 Plan included assistance such as tutoring, allowing Jane to leave class as needed to see her Social Worker or the school nurse, and prioritizing her various assignments. [8] *Id.*

On November 14, 2016, Dr. Bowker-Kinley faxed a letter to CEHS stating that she had diagnosed Jane with "Generalized Anxiety Disorder" and further indicating that in her opinion, "the symptoms and challenges associated with the . . . diagnosis interfere with the young person's ability to fully participate in their education," such that she "would qualify for, and benefit from, a 504 plan at school." *R.* 948. Ms. Murphy-Lewis later testified that this was the first time CEHS received documentation of a formal mental health diagnosis from one of Jane's providers. *R.* 3982.

Near the end of November, CEHS administrators testify they made a truancy referral against the Does to the Department of Health and Human Services ("DHHS"); however, DHHS declined to open any proceedings against the Does. *R.* 1310, 4197.

On December 2, 2016, because CEHS was not able to implement the 504 Plan due to Jane's failure to attend school regularly, Ms. Murphy-Lewis sent an email to the head of the CEHS special education department indicating her desire to refer Jane for a Special Education Evaluation.[9] *R.* 304, 1314. On December 6, 2016, CEHS staff met with the Does to explain the special education referral process and to obtain consent for Jane's

---

[8] Although the Does deny receiving any written notice of their rights under Section 504 at this meeting, the paperwork signed by Principal Shedd reflects that the Does were provided with notice. *R.* 942.

[9] School psychologist Dr. Alina Maria Perez later described this as "a pretty quick turnaround" because "[u]sually, [CEHS] leave[s] time for the 504 plan to be in place and determine if it's being effective" before referring a student to special education. *R.* 4419.

evaluations. *R.* 949. Ms. Doe signed the consent form, which indicated she had "received the statement of procedural safeguards attached to [the] consent form."[10] *R.* 951. This form also indicated that the deadline to hold an Individualized Education Program ("IEP") Team Eligibility Meeting was forty-five school days upon receipt of consent, or, in this case, February 27, 2017. R. 949, 3573.

After winter break, Jane's pattern of poor attendance once again resumed. *R.* 2174. In January 2017, the Does began to explore other options for Jane, including an intensive residential program at McLean Hospital in Massachusetts. *R.* 3251-53. The Does also hired Margie Shaffel, an educational consultant who "works closely with McLean," to serve as a resource for placement information for Jane. *R.* 1410.

In the meantime, the school psychologist, Rosemary Kooy, began working on Jane's special education evaluation and reached out to the Does to schedule a parent interview. *R.* 1426-30. By early February, Ms. Kooy had sent out the parent rating scales, conducted an interview with the Does, and interviewed Ms. Murphy-Lewis. *R.* 405, 1427, 1436. On February 7, 2017, Ms. Kooy contacted Jane via email to set up a time for testing, an interview, and observation. *R.* 1456. Jane did not reply to Ms. Kooy's email, so Ms. Kooy contacted Mr. Doe directly. *R.* 1460. Mr. Doe responded and confirmed Jane's resistance to testing, indicated that he would discuss Ms. Kooy's request with Jane, but concluded that he was "not optimistic" Jane would comply. *Id.*

---

[10] The Plaintiffs assert they did not receive a copy of the procedural safeguards at this meeting. Pl.'s Mem. ¶ 24 (ECF No. 15, #63). However, the hearing officer credited Principal Shedd's testimony (which was corroborated by Ms. Murphy-Lewis) that "although he had no specific recollection of giving the Parents procedural safeguards, it was standard practice for the special education case manager to do so" and ultimately concluding that the Does "failed to meet [the] burden" of "proving, by a preponderance of the evidence, that they were not provided with procedural safeguards in a timely manner." *R.* 343-44.

The school scheduled the Step 2 IEP meeting for February 17, 2017.  *R.* 967.

On February 10, 2017, McLean Hospital accepted Jane for voluntary admission.  *R.* 1477.  However, on February 14, 2017, when Mr. Doe informed Jane that she would be admitted to McLean that day, Jane "became hysterical and refused to accompany him there."  *R.* 2896.  Mr. Doe called the Cape Elizabeth Police who eventually handcuffed Jane because she refused to cooperate with the responding officers.  *Id.*  The police escorted her to Maine Medical Center.  *Id.*  Jane was eventually transferred from Maine Medical Center to Spring Harbor and admitted for her first inpatient hospitalization.  *R.* 981.

On February 14, 2017, Ms. Murphy-Lewis spoke with the Does and then memorialized their conversation via email.  *R.* 974.  In her email, Ms. Murphy-Lewis reiterated that the CEHS team had met that morning to discuss Jane's Special Education testing, noting that "[d]ue to student absences, psychological and academic testing have yet to be completed." [11]  *Id.*  Furthermore, she repeated the team's proposal to "extend the IEP evaluation process and meet within 15 school days from [February 14, 2017]" considering Jane's absences and impeding admission to McLean.  *R.* 974, 1457, 1485.  The record contains no objection from either of the Does to the extension request.

Spring Harbor discharged Jane on February 23, 2017.  *R.* 987.  Upon discharge, the Does arranged for Jane to be immediately transferred to a wilderness program called Trails Carolina in North Carolina.  *R.* 991, 993.  The Does notified CEHS of this placement via

---

[11] In their later filings, the Does indicate that by setting the Step 2 meeting for February 17, 2016, CEHS also triggered a second statutory deadline: "Per Maine law, *M[]SER* §§ V.4.B & V.4.G, [CEHS] was obligated to send the [special education evaluation] reports to the Does no later than February 14, three days before the scheduled meeting."  Pl.'s Mem. ¶ 33 (ECF No. 15, #65).  Clearly, as testing had not been completed, CEHS did not provide the Does with copies of evaluation reports on February 14, 2016.

email on February 24, 2017, and relayed that Jane would remain at Trails for ten to twelve weeks.  *R.* 411.

On March 3, 2017, Ms. Murphy-Lewis sent the Does a "follow-up" email to "confirm that due to the placement of Trails Carolina, [CEHS] will be suspending the process to refer to special education services until [Jane] returns to us upon her completion of the program."  *R.* 413.  In this email, Ms. Murphy-Lewis also requested copies of any evaluations or assessments conducted on Jane so the assessments could be "a part of our special education referral process when it resumes when [Jane] returns to Cape Elizabeth."  *R.* 1504.  Ms. Doe responded to this email and did not contest the suspension of the special education referral and confirmed that she would "pass along . . . any helpful information . . . receive[d] from Trails."  *R.* 413, 1503

After receiving no information from Trails, Ms. Murphy-Lewis reached out to the Does a second time on April 11, 2017, and reiterated her request for copies of any assessments or evaluations.  *R.* 1507.  When Ms. Murphy-Lewis did not hear back from the Does, she called them and during their conversation, the Does informed her that they intended to place Jane at a therapeutic boarding school following her discharge from Trails.  *R.* 1508.

On May 4, 2017, Mr. Doe emailed CEHS's special education director to reaffirm the Does' decision to place Jane at Vista Sage in Sandy, Utah, a therapeutic boarding school, following Jane's graduation from the Trails program.  *R.* 1511.  In this email, Mr.

Doe provided a copy of a psychological evaluation completed by Dr. Carlyn Daub, Ph.D.,[12] and stated his conclusion – which he affirmed was supported by Dr. Daub and the staff at Trails Carolina – that Jane "cannot appropriately return to a public-school placement or any other less restrictive placement, with or without specialized services, at this time."[13] *Id.* Additionally, Mr. Doe notified CEHS that the Does would be seeking "reimbursement of the costs we are about to incur for this placement . . . because, unfortunately, [Jane] cannot currently be educated appropriately in a less restrictive setting." *Id.*

On May 12, 2017, CEHS's special education director sent the Does a letter to explain why Jane's special education referral process had not yet been completed. *R.* 1040. She stated:

> Although the School Department began the evaluation process, we were not able to complete it due in part to [Jane's] absences on days that testing was scheduled, and because [Jane] was hospitalized on February 13 due to an incident which occurred outside of school, first at Maine Medical Center and then at Spring Harbor Hospital. As you know, [Jane] never returned to Cape Elizabeth, and so we were never able to complete her testing to determine her eligibility for special education.

*Id.* On May 12, 2017, because CEHS had finally received some of the documentation requested from Trails Carolina and Dr. Daubs, CEHS proposed "conven[ing] an IEP

---

[12] The hearing officer strongly rejected the medical opinion of Dr. Daubs, stating: "I have been an adjudicator for IDEA disputes since 2002 and have read hundreds if not thousands of psychological evaluations. Dr. Daubs' report is the only one I can recall by a psychologist who did not provide data to support her testing or her conclusions. The Parents claimed they wanted full transparency in the process, but Dr. Daubs was the opposite of transparent. . . . Her evaluation of the Student made conclusions that lacked supporting evidence, contained inappropriate test choices and assorted errors." *R.* 331-32.

[13] As noted by the hearing officer: "[T]here were no actual documented issues in Trails' discharge summary or Dr. Daubs' report that supported the need for a residential treatment placement. Furthermore, none of the other mental health professionals who had seen or treated the Student in the past had made such a recommendation." *R.* 318.

meeting to determine 1) if we have sufficient information to determine eligibility for special education and 2) if not, what additional information we would need." *Id.*

On June 9, 2017, Jane's IEP team met to review the Daubs and Paradis report and to determine whether Jane qualified for special education based on the reports.[14] *R.* 1075. The meeting records once again indicate the Does were provided with Procedural Safeguards at the start of the meeting and the Does signed forms to that effect. *R.* 1076. After reviewing the two evaluations, the IEP team concluded first that they did not have enough information to make an eligibility determination as the two outside evaluations failed to "adequately address[] problems [Jane] had in relation to school" or to include a school observation. *Id.* Second, the team determined that CEHS would need to conduct a Functional Behavioral Analysis ("FBA") to determine if Jane qualified for special education services. *Id.* As part of this Functional Behavioral Analysis, CEHS planned for an evaluator to "speak with staff at both [residential school] locations and observe [Jane] in her current setting." *Id.* The Does provided only limited consent to the FBA and prohibited any communications with Jane or clinical evaluators outside the presence of Mr. or Ms. Doe.[15] *R.* 1078. Because the Does were unwilling to provide unlimited consent, Dr. Blier – an independent psychologist who attended the IEP team meeting and who was asked by CEHS to complete the FBA – was unable to conduct the FBA as evaluating a

---

[14] School psychologist Dr. Alina Perez attended the meeting and reviewed the evaluations for the team. *R.* 1077. Independent psychologist Dr. Heather Blier also attended the meeting to provide additional expertise and participated in the review of the information provided to the IEP team. *R.* 1077-78.

[15] Independent psychologist Dr. Blier "stated that she would be unable to do the FBA if the parents insisted on being present for clinical interviews." *R.* 1078. Despite this, the parents' representative indicated they would not be willing to provide full consent.

child with her parents present would have been a deviation from her standard of practice. *R.* 1091.

## IV.    TWELFTH GRADE (2017-2018)

Jane remained at Vista Sage throughout the summer leading into her twelfth-grade year. Due to Dr. Blier's unwillingness to conduct the FBA, CEHS contracted with Dr. Thomas Higbee, Ph.D., BCBA-D, of Utah State University to perform the FBA. *R.* 1108. On September 20, 2017, Dr. Higbee interviewed Jane at Vista Sage.[16] *R.* 1150. In his report he explained that an FBA "is typically conducted when a student in public education is engaging in aberrant behavior that is so severe or intense that it places the student at risk for being placed in a more restrictive educational environment." *R.* 1148. However, because his behavioral observation and staff reports indicated that Jane had been "a 'model citizen' since arrival and that she had not displayed any significant behavioral problems," he concluded it was impossible to conduct the FBA as there "was no aberrant behavior for [him] to assess." *Id.*

On October 24, 2017, Jane's IEP team met once again and based on Dr. Higbee's conclusions determined that Jane was eligible for special education services "under the disability category of Other Health Impairment." *R.* 1168. At this meeting, the Does

---

[16] During this interview, Dr. Higabee asked Jane "what led to [her] not having success in [high school]." *R.* 1152. In response, Jane related that she had been in a car accident, received a concussion, and stayed at home for a month, which resulted in her falling behind in her coursework. *R.* 1152. She then stated that falling behind led to her feeling "really overwhelmed" and so she "stayed home to escape from the overwhelming amount of work." *R.* 1152.

signed a notice that they had been "given and reviewed [their] annual copy of the Notice of Procedural Safeguards." *R*. 1175. [17]

## THE ADMINISTRATIVE DECISION

On November 1, 2017, the Does filed a hearing request with the Maine Department of Education. *R*. 279. A Special Education Due Process Hearing Officer conducted a hearing over seven days in January and February, 2018. *Id.* In preparation for the hearing, the parties submitted nearly 2,500 pages of exhibits. *R*. 280. Witnesses at the hearing included Mr. and Mrs. Doe, several of Jane's treating physicians and counselors, and administrators and staff from Cape Elizabeth High School. *R*. 279.

At the close of the hearing, the hearing officer found in favor of the Defendant, Cape Elizabeth School Department. Specifically, the hearing officer held:

1. The District did not violate its child find obligation or its obligation to evaluate, identify and place [Jane] in special education.

2. The District did not violate the IDEA by failing to provide the Parents with notice of their procedural safeguards.

3. As the District did not violate the IDEA, it is not responsible [for] any costs incurred by the Parents associate with their unilateral placement of the Student at Trails or Vista Sage.

*R*. 345.

---

[17] Jane completed her high school requirements early and graduated from high school on January 23, 2018, with a GPA of 3.56. R. 2165. Since graduation, Jane has remained in Utah in a "step down" program and has been accepted to several colleges. R. 3026.

# DISCUSSION

## I.   STANDARD OF REVIEW

The IDEA requires that I review the administrative record arising from the due process hearing, giving "appropriate deference" to the hearing officer in light of her expertise in the administration of special education services.  *Greenbush Sch. Comm. v. Mr. & Mrs. K*, 949 F. Supp. 934, 938 (D. Me. 1996); *see also* 20 U.S.C. § 1415(i)(2)(C); *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 989 (1st Cir. 1990) ("Jurists are not trained, practicing educators. Thus, the statutory scheme binds trial courts to give due weight to the state agency's decision in order to prevent judges from imposing their view of preferable educational methods upon the States.") (citations and internal punctuation omitted).  When dealing with issues that implicate factual determinations made by the administrative agency, I will give more deference to the hearing officer's findings. *Lamoine Sch. Comm. v. Ms. Z. ex rel. N.S.*, 353 F. Supp. 2d 18, 30 (D. Me. 2005); *cf. J.B. v. Wells-Ogunquit Cmty. Sch. Dist.*, 2014 WL 4100903, at *4-5 (D. Me. Aug.  18, 2014) ("Even as to findings of fact, the court retains the discretion, after careful consideration, 'to accept or reject the findings in part or in whole.'") (citing *Town of Burlington v. Department of Educ.,* 736 F.2d 773, 792 (1st Cir. 1984), *aff'd* 471 U.S. 359 (1985)). However, when confronting an issue that is "more a matter of law," I will give less deference as "the educational expertise of the agency is not implicated."  *Mr. I v. Maine Sch. Admin. Dist. 55*, 416 F. Supp. 2d 147, 157 (D. Me. 2006), *aff'd*, 480 F.3d 1 (1st Cir. 2007); *see also Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) ("Less weight is due to an agency's determinations on matters for which educational

expertise is not relevant because a federal court is just as well suited to evaluate the situation.").  As stated by the First Circuit, "[a]lthough the exact quantum of weight [given to the administrative proceedings] is subject to the district judge's exercise of informed discretion, the judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1087 (1st Cir. 1993) (internal citations omitted); *see also G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 946 (1st Cir.1991) (*quoting Burlington*, 736 F.2d at 792) ("While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately 'left to the discretion of the trial court.'").

Following this review,[18] I must then make an "independent decision whether the Hearing Officer's determination is supported by a preponderance of the evidence." *Greenbush Sch. Comm.*, 949 F. Supp. at 938; *see also Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83 (1st Cir. 2004) (reaffirming that the court's "independence is tempered by the requirement that the court give 'due weight' to the hearing officer's findings"); *Roland M.*, 910 F.2d at 989 (indicating that the reviewing court must make an "independent ruling based on the preponderance of the evidence").  Thus, my review "falls somewhere between the highly deferential clear-error standard and the non-deferential *de novo* standard" – an intermediate level of review that has been characterized as "one of

---

[18] If the parties had made a request, the IDEA requires me to "hear additional evidence."  20 U.S.C. § 1415(i)(2)(C)(ii).  However, as the parties have made no such request, I am under no requirement to review additional evidence.

involved oversight."[19] *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 36 (1st Cir. 2012) (internal quotation marks and citations omitted).

Finally, the party seeking relief from the hearing officer's findings or decision shoulders the burden of persuasion. *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 54 (1st Cir. 1992); *Mr. I*, 416 F. Supp. 2d at 156. Thus, the Does must prove by a preponderance of evidence "that the hearing officer's award was contrary to law or without factual support." *Maine Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R.*, 176 F.Supp.2d 15, 23 (D. Me. 2001), (rec. dec., *aff'd* Feb. 27, 2002), *rev'd on other grounds,* 321 F.3d 9 (1st Cir. 2003); *R.C. v. York Sch. Dep't*, 2008 WL 4427194, at *26 (D. Me. Sept. 25, 2008), *aff'd*, 2008 WL 5135239 (D. Me. Dec. 5, 2008) ("The Parents bear the burden of persuasion that the decision they challenge was wrong.").

## II.  ANALYSIS

Plaintiffs seek review of the hearing officer's decision and assert the hearing officer erred "both as a matter of law and as a matter of fact." Compl., 21 (ECF No. 1, #21). Plaintiffs' specific contentions, which this analysis will track, are that Cape Elizabeth School District (A) waited too long to identify Jane as eligible for special education and refer her for evaluation, thereby violating her right to a FAPE under the IDEA; (B) failed to evaluate Jane within the regulatory forty-five school day time frame; and (C) failed to

---

[19] In applying this standard, "[f]irst, the Court carefully reviews the entire record of the due process hearing. Second, appropriate deference is given the Hearing Officer and [her] expertise, particularly with regard to factual determinations. Finally, the Court makes an independent decision whether the Hearing Officer's determination is supported by a preponderance of the evidence. The Court may also account for additional facts presented by the parties should it find such facts credible and supported by the evidence on the record." *Greenbush Sch. Comm. v. Mr. & Mrs. K*, 949 F. Supp. 934, 938 (D. Me. 1996).

provide the Does with notice of procedural safeguards under IDEA in a timely manner. Compl. 22 (ECF No. 1, #22). Furthermore, the Does allege (D) that the hearing officer failed to "conduct the proper legal analysis" when she allowed "bias to infect her view of the evidence." Pl.'s Mem. of Law ("Pl.'s Mem."), 18 (ECF No. 15, #74). Finally, based on these alleged violations, Plaintiffs request (E) that this Court not only vacate or reverse the hearing officer's order, but also order Defendant to reimburse Plaintiffs for all costs associated with Jane's unilateral placement at Trails Carolina and Vista Sage, costs associated with Plaintiffs' hiring of evaluation and educational consultants, costs of Jane's post-graduation transition program, and Plaintiffs' attorney's fees and costs. *Id.*

## A. CHILD FIND OBLIGATION

The Does first contend the Cape Elizabeth School Department violated its "Child Find" obligation under the IDEA by failing to promptly identify Jane as eligible for special education. Pl.'s Mem., 20 (ECF No. 15, #76).

Schools receiving federal funding are required by law to have procedures and policies in place to ensure they identify (and then evaluate) "[a]ll children with disabilities . . . regardless of the severity of their disabilities . . . who are in need of special education and related services," 20 U.S.C. § 1412(a)(3)(A), as well as "[c]hildren who are *suspected* of being a child with a disability . . . even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c)(1) (emphasis added); *see also* 05-071 C.M.R. ch. 101 ("MSER") § IV(2) (describing Maine schools' "child find" obligations for children age three to twenty). A child is considered a "child with a disability" when the child has one of thirteen disabling

conditions[20] and "by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3)(A); 20-A M.R.S. § 7001(1-B)(B). The initial issue of eligibility for special education services involves a "'difficult and sensitive' analysis." *Mr. I. ex rel. L.I.*, 480 F.3d at 4.

As indicated by the statutory language, generally a school's "child-find duty" requires the school to identify and refer a child when the school has reason to suspect a student has a disability that will impact educational performance coupled with "reason to suspect that special education services may be needed to address that disability." *C.G. v. Five Town Cmty. Sch. Dist.*, No. 2:05-cv-237, 2007 WL 494994, at *25 (D. Me. Feb. 12, 2007), *report and recommendation adopted*, 2007 WL 1051650 (D. Me. Apr. 6, 2007), *aff'd*, 513 F.3d 279 (1st Cir. 2008); *see also Mr. I. ex rel. L.I.,* 480 F.3d at 16 ("the regulation sensibly demands that a disability cannot qualify a child for IDEA benefits unless it has a negative effect on educational performance; no effect, or a positive one, will not do."); *Mr. I*, 416 F. Supp. 2d at 161 ("The mere fact of a diagnosis . . . does not automatically qualify a child for special education under IDEA; the disability must adversely affect the child's educational performance."). Because the IDEA does not define the phrase "adversely affects . . . educational performance," each individual state "[gives] substance to these terms." *Mr. I,* 416 F. Supp. 2d at 157 (quoting *J.D. ex rel. J.D. v. Pawlet*

---

[20] The thirteen enumerated disabling conditions are: "intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as 'emotional disturbance'), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities." 20 U.S.C. § 1401(3)(A)(i); *see also* 20-A M.R.S. § 7001(1-B)(B)(2) (adding "[d]eafness and blindness" and "[m]ultiple disabilities" to the list of enumerated disabling conditions).

*Sch. Dist.*, 224 F.3d 60, 66 (2d Cir. 2000)).  In Maine, the term 'educational performance' encompasses "performance in . . . academic and functional areas . . . including, but not limited to, those areas that are being assessed through the local [school administrative unit]'s own curriculum."  MSER § II(10).  'Functional performance' is a measurement of "how the child demonstrates his/her skills and behaviors in cognition, communication, motor, adaptive, social/emotional and sensory areas."  MSER § II(15).

In short, a school's child-find duty is implicated when it is faced with a three-prong factual scenario: first the child is a child with a disability enumerated in statute or the school has reason to suspect the child is impaired with such a disability; second, the child's disabling condition adversely affects the child's 'educational performance'; and third, special education services may be needed to address the child's disability.  *See Mr. I. ex rel. L.I.*, 480 F.3d at 13 ("[A] finding that a child['s] . . . disability adversely affects educational performance – to whatever degree – does not itself entitle the child to special education and related services under the IDEA. . . . The child must also need special education and related services by reason of the disability.") (internal citations omitted).

Additionally, in Maine, the child-find process may also be prompted by absenteeism alone.  *See* MSER § IV(2)(A) ("Each [school administrative unit] shall maintain and implement policies and procedures to ensure that . . . children who have the equivalent of 10 full days of unexcused absences or 7 consecutive school days of unexcused absences during a school year . . . and who are in need of special education and related services, even though they are advancing from grade to grade, are identified, located and evaluated at public expense.").

In their briefs, Plaintiffs argue that consideration of CEHS's child-find duty required the hearing officer to determine a specific "trigger" date on which CEHS was required to make an IDEA referral, and they further contend that all or most of the merits associated with their dispute logically flow from this calendaring exercise. Pl.'s Mem. 18 (ECF No. 15, #74). The "trigger" concept is not unheard of in this area of law and searching that term will yield a collection of cases that contemplate what set of circumstances, in a given case, "trigger" educational referrals. However, suggesting that the child-find factors provide a calculus for calendaring one specific trigger date to the exclusion of all others is unwarranted. School staff considering a student's need for either an accommodation or special education services are not charting planetary motion with astronomical instruments, but are instead deciding how best to facilitate educational objectives for a unique child with particular issues in a particular school setting. In this sense, the child-find factors, in my view, should not be regarded as a clockwork armillary sphere. The standard of reasonableness calls for a measure of leeway to explore whether a school's referral occurred at an appropriate time.

### 1. Ninth & Tenth Grade

The hearing officer concluded CEHS did not violate its child-find duty when it did not refer Jane for services in ninth and tenth grade. *R.* 335. I agree. The record indicates that despite the growing discord in the Doe home, this turmoil was not reflected in Jane's educational performance. Throughout these two years of school, Jane maintained excellent grades and earned an unweighted GPA of 91.85 and 89.32 in ninth-grade and tenth-grade, respectively. *R.* 889, 904. Additionally, Jane had only one unexcused absence during the

two total years – a figure that falls far short of the statutorily-defined absenteeism referral requirement.[21]  Furthermore, Jane's guidance counselor and parents repeatedly reported the absence of disciplinary problems at school.  *R.* 890; 2629; 2697 (recording that "[Jane] ha[d] no [history] of emotional dysregulation or behavioral issues within the school environment" and further noting that the Does "report[ed] that [Jane] has never been in trouble for aggression or violence").

Although the school was aware of the atmosphere in the Does' home and that Jane was receiving services outside of school that were impacting her ability to keep up in school, during Jane's tenth-grade year, the school 'intervention team' – a group of individuals not only experienced in and tasked with the responsibility of identifying children who may need assistance, but also familiar with Jane on a personal level – reasonably concluded that the need for special education services was not evident.  *R.* 4312. On this point, I defer to the expertise of the hearing officer who saw no reason not to credit the perspectives of the teachers and administrators who had the opportunity to observe Jane closely over her ninth and tenth-grade years in the academic setting.  Because the record supports CEHS's determination that Jane's disability, which up until March, 2016 remained undiagnosed and was not disclosed to CEHS until the following school year, had minimal – if any – effect on her educational performance during her ninth and tenth-grade years, her disability did not implicate CEHS's child-find requirements and certainly did

---

[21] At the close of her ninth-grade year, Jane had no unexcused absences (all other absences – especially her time spent at Hyde – had been excused).  *R.* 2170.  At the close of her tenth-grade year, Jane had only one unexcused absence.  *R.* 2170.

not compel a finding that IDEA services were appropriate at that time.[22]  Additionally, although Jane's unilateral placement at the Hyde School lasted six weeks, I see no reason why that private placement would necessarily set in motion the absenteeism provision of Maine law, given that the placement was not an "unexcused" absence.

### 2. Eleventh Grade

As underscored by the hearing officer, it was not until the eleventh-grade that "the impact of [Jane's family] relationship problems [began] spilling into school." *R.* 335.  The hearing officer found that early on in the schoolyear, Ms. Murphy-Lewis and Principal Shedd were attuned to Jane, but could only infer so much given the failure of the Does to share Dr. Paradis's evaluation. *R.* 335.  Furthermore, the hearing officer determined that Ms. Murphy-Lewis acted reasonably when she instituted the 504 process upon learning of Dr. Bowker-Kinley's diagnosis. *Id.*  She also found that the MSER did not "mandate" a special education referral based on Jane's absenteeism. *R.* 336.  I agree.

As noted by her teachers and school administrators, Jane missed a significant amount of schoolwork early on in her eleventh-grade year. *R.* 1247, 1250, 1262.  By mid-October, Jane's academics were suffering, prompting Ms. Murphy-Lewis to send an email to Jane's teachers requesting an update on which classes Jane was "in danger of failing for the first quarter." *R.* 1261.  A review of her attendance record tells a similar story.  Up

---

[22] As the hearing officer concluded, "[e]vidence of problems at home without a corresponding impact on educational or functional performance in school is not sufficient to trigger child find.  The IDEA does not require schools to address behaviors that have minimal, if any, impact upon the Student at school." *R.* 334; *see also Gonzalez v. Puerto Rico Dep't of Educ.*, 254 F.3d 350, 352 (1st Cir. 2001) (indicating that schools need not address "problems truly 'distinct' from learning problems" as "[e]ducational benefit is indeed the touchstone in determining the extent of governmental obligations under the IDEA.").

until Jane's 504 referral on October 10, 2016, she was absent seven times. *R.* 2171-72. Between the referral and the 504 Determination Meeting held on November 10, 2016, Jane was absent eight more times. *R.* 2172. From the time of her 504 Determination Meeting to CEHS receiving the Does' consent for a special education evaluation on December 6, 2016, Jane was absent another eleven times. *R.* 2172-73. In sum, from the time school started to the time CEHS received the Does' consent to evaluate Jane for special education, Jane had twenty-six absences. School attendance records, however, reflect that of the twenty-six absences, only seven were regarded as "unexcused," and they were not consecutive. *R.* 2172-73.

While the sharp decline in Jane's attendance was clearly alarming to CEHS administrators, as determined by the hearing officer, Jane's absences fell short of Maine's statutory absenteeism standard, which turns on the existence of "unexcused" absences. *See* MSER § IV(2)(A) (requiring "the equivalent of 10 full days of unexcused absences or 7 consecutive school days of unexcused absences during a school year" to implicate a school's child-find obligation); *see also R.* 334 (indicating that at the time of the 504 referral, Jane "had not yet met the threshold number of absences which would have mandated such a referral"). Furthermore, as CEHS argues and as the hearing officer noted approvingly, a majority of Jane's early absences and the corresponding adverse impact on her educational performance could be attributed to issues unrelated to disability or suspected disability – a scenario that likewise fails to implicate CEHS's child-find obligation.

In support of this stance, CEHS first points to the concussion Jane sustained on September 16, 2016.[23]  *R.* 2581.  The school health office recorded that Jane slowly progressed through the stages of her concussion and did not reach the "green zone" until September 27, 2016.  *R.* 1052.  Similarly, Jane was regularly seen in the health office during this period and consistently complained of complications arising from her concussion.  *R.* 1053.  It was not until after September 30, 2016 that Jane's complaints transitioned from concussion-related symptoms to those of "emotional concern" or other unrelated health issues.  *R.* 1053.  In addition to the concussion, as Ms. Murphy-Lewis explained, "different factors [were] converging" in Jane's life, including her "living arrangements, her relationship with her parents, anxiety and feeling like she did not fit in with the culture at CEHS."  *R.* 335.  As the hearing officer concluded, "[t]hese factors would not necessarily have prompted a special education referral."  *R.* 335.

Without a causal link to a disability or suspected disability, the decline in Jane's educational performance was insufficient to obligate CEHS to identify and refer Jane in accordance with its child-find duty.  And while the sheer number of absences certainly set off alarm bells, I am not persuaded by Plaintiffs' position that the MSER compelled a different conclusion under Maine law.  Furthermore, for reasons set forth, *infra*, in sections B.2 and D, even if CEHS had instituted an IEP referral or attempted an evaluation in October or November, 2016, Plaintiffs have not persuaded me that this matter would have unfolded any differently than it did in terms of their participation, or that, had the Does and

---

[23] In my view, the hearing officer correctly observed that "unless [Jane's] concussion had been more serious and resulted in a traumatic brain injury," standing alone, the concussion was insufficient to be considered a disability for purposes of the statutory requirements.  *R.* 335

Jane participated in the process, the end result would have dictated an IEP calling for a private residential program.

Despite the possible non-disability culprits for Jane's educational decline, on October 10, 2016, Ms. Murphy-Lewis nevertheless made a request to initiate the development of a 504 Plan to accommodate Jane under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794,[24] only five school days after Jane's first complaint of emotional concern to the school nurse – an approach which Jane's treating psychiatrist, Dr. Bowker-Kinley, independently recommended. *R.* 948, 1253, 1258.

Plaintiffs argue the 504 referral was too little, too late. Specifically, they assert that "[b]y early October, ample evidence supported a suspicion that Jane could require special education and related services" and therefore Ms. Murphy-Lewis's 504 referral was an insufficient response. Pl.'s Memo. 21 (ECF No. 15, #77). Jane, they assert, should have been referred to special education immediately.[25] *Id.* However, like the hearing officer, I

---

[24] As stated by the Second Circuit:

> The purposes of the Rehabilitation Act are similar to that of the IDEA, but the Rehabilitation Act is broader in scope. This statute provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." [29 U.S.C.] § 794(a). The definition of "individual with a disability" under § 504 of the Rehabilitation Act is broader in certain respects than the definition of a "child with [a] disabilit[y]" under the IDEA. *Compare* 29 U.S.C. § 706(8)(B) *with* 20 U.S.C. § 1401(a)(1)(A). For example, § 504's reach extends not only to individuals who in fact have a disability, but also to individuals who are regarded as having such a disability (whether or not that perception is correct). *See* 29 U.S.C. § 706(8)(B)(iii).

> *Muller on Behalf of Muller v. Comm. on Special Educ. of E. Islip Union Free Sch. Dist.*, 145 F.3d 95, 100 n.2 (2d Cir. 1998).

[25] Plaintiffs do not fault CEHS's choice to provide accommodations in the form of a 504 plan, but instead argue that Jane should have been referred to special education concurrently.

see no violation under IDEA arising from the time between CEHS's referral for a Section 504 plan and Jane's referral to special education.

If a student is identified through the child-find process as a "child [who] may require special education and related services in order to benefit from regular education," then that child "shall be referred to the Individualized Education Program (IEP) Team to determine the child's eligibility for special education services." MSER § IV(2)(D). Although "a section 504 plan typically is not an adequate substitute for an IEP," *Reg'l Sch. Unit 51 v. Doe*, 920 F. Supp. 2d 168, 204–05 (D. Me. 2013), it is nevertheless eminently reasonable, and therefore permissible, in some cases, for a school to pursue general education interventions in the form of a 504 plan prior to referral to special education. *See* MSER § IV(2)(E)(2) (allowing for "any professional employee" to make a referral to special education "regardless of the results of the initial child find activities, *but after completion of the general education intervention process*, when fully implemented") (emphasis added); *see also A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221, 225– 26 (D. Conn. 2008), *aff'd sub nom. A.P. v. Woodstock Bd. of Educ.,* 370 F. App'x 202 (2d Cir. 2010) (holding that a school board had not violated its child-find obligation because the student "responded well" to academic assistance from his teacher and therefore "did not need special education services").

Thus, while CEHS undoubtedly could have referred Jane to special education on the same day she received a referral for a Section 504 plan, CEHS was not statutorily obligated to do so, especially as general education interventions had enabled Jane to successfully overcome her educational struggles in the previous schoolyear. Viewed objectively, prior

to the implementation of the 504 Plan, Jane still failed to meet the three-prong criteria that would obligate CEHS to identify and refer Jane. *R.* 336. That is, the need for special education services to address performance deficits was not evident given the nature of the dysfunction in the home and the lack of evidence indicating there was a deficit in Jane's actual educational capabilities. In effect, it was reasonable for CEHS to conclude that Jane's particular circumstance did not require special education services as much as modifications to her schedule, performance deadlines, attendance requirements, designated public school setting, and the like, to accommodate her anxiety triggered by a dysfunctional home life.[26] *See, e.g., J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 663 (S.D.N.Y. 2011) ("[E]ven if the District should have known at this point that [the student] had [a disability] – as opposed to thinking she was merely going through a difficult time in her life – the IDEA's child find requirement only applies to children who are disabled *and* in need of special education and related services.") (emphasis in original). Furthermore, as the hearing officer noted, "[i]t is not unusual in a situation like this for a school department to see whether Section 504 accommodations were helpful to the Student before considering a special education referral, and a diagnosis of GAD does not automatically mean a student requires special education to succeed in school." *R.* 336.

CEHS ultimately made its IDEA referral in December, 2016, and this timeframe appears to me to have been appropriate, all things considered. I, therefore, concur in the

---

[26] Jane, the Does, and CEHS Administrators also discussed the option of transferring to other schools in the Portland or South Portland area. *R.* 1330-31. In mid-December 2016, Jane received approval to attend Portland High School. *R.* 1352. Although Jane was initially amenable to this option, *R.* 1330, she ultimately decided against transferring to Portland High School. *R.* 1370.

hearing officer's finding that CEHS did not violate its child-find obligation under the IDEA.

## B. Evaluation Delay

The Does next claim CEHS violated the IDEA when it failed to evaluate Jane within forty-five days of receiving their signed consent-to-evaluate form on December 6, 2016, as required by Maine law. *See* MSER § V(1)(A)(3)(a)(i); *see also* R. 951.

In Maine, following a referral to special education, a school is tasked with completing "a full and individual initial evaluation" and convening a team to determine eligibility within forty-five days of its receipt of parental consent for evaluation of a student in the public school system. MSER § V(1)(A)(1), (3). *See also* 20 U.S.C. § 1414(a)(1)(A), (C).[27] The goal of this initial evaluation is to "determine if the child is a child with a disability and to determine the educational needs of the child." MSER § V(1)(A)(3)(a)(i). *See also* 20 U.S.C. § 1414(a)(1)(C)(i). As part of this evaluation, evaluators must, "if appropriate," review existing evaluation data on the student,[28] but this review may take place outside of a formal IEP Team meeting. MSER § V(3)(A), (B).

Importantly, if "[t]he parent of a child repeatedly fails or refuses to produce the child for the evaluation," then the forty-five day deadline "shall not apply to a [school

---

[27] The forty-five day timeframe is established by Maine law. Federal law allows sixty days, but permits the states to establish a more demanding deadline. 20 U.S.C. § 1414(a)(1)(C)(i)(I).

[28] This "existing evaluation data" includes "(a) Evaluations and information provided by the parents of the child; (b) Current classroom-based, local, or State assessments, and classroom-based observations; and (c) Observations by teachers and related services providers." MSER § V(3)(A)(1). However, a school district is well within its rights to require independent testing of a child. *See, e.g., Andress v. Cleveland Indep. Sch. Dist.*, 64 F.3d 176, 178 (5th Cir. 1995) ("If a student's parents want him to receive special education under IDEA, they must allow the school itself to reevaluate the student and they cannot force the school to rely solely on an independent evaluation.").

administrative unit].”  MSER § V(1)(A)(3)(b)(ii); *see also* 20 U.S.C. § 1414(a)(1)(C)(ii)(II) (providing for a similar exception).

### 1. Evaluation of Prior Data

Plaintiffs contest that “IEP Team members never reviewed existing data on Jane.” Pl.’s Mem., 24 (ECF No. 15, #80).  However, Plaintiffs fail to point to any existing data that was not considered by the IEP team.

### 2. Independent Evaluation within Forty-five Days

On this point, Plaintiffs primarily assert that “the effect of Jane’s mental health disability meant that she was almost never at school.”  Pls.’ Mem. 24.  Their argument follows that because “Jane was not functioning in a way that permitted typical in-school testing and observation, the IEP Team had an obligation to design an evaluation process to capture any needed information without expecting Jane to be tested at school.”  *Id.*

Between December 6, 2016 (the date the Does signed CEHS’s consent form for special education evaluation) and February 27, 2017 (the original forty-five day deadline), Jane was present in school fourteen total days.  *R.* 931; 2173-75.  After Ms. Kooy’s February 7, 2017 email to Jane requesting to schedule an interview, testing, and observation, Jane was present at CEHS only two days.[29]  *R.* 1456, 2173-75.  While finding innovative ways to meet with Jane outside of the school environment may have allowed

---

[29] The Plaintiffs once again contend Ms. Kooy’s efforts were too little, too late.  Pl.’s Mem. 27-28.  However, it would be speculation on my part to attempt to divine whether or not Ms. Kooy would have had time to complete her evaluation prior the statutory deadline.  On this point, I rely on the expertise of the hearing officer who concluded after reviewing the record and receiving testimony in the due process hearing that the record “supports a conclusion that [the District’s evaluator] would have had time to complete [the evaluation process], had the student been available.”  *R.* 337.

Ms. Kooy to complete her evaluation within the forty-five day window, Plaintiffs fail to establish any affirmative duty on the part of CEHS to utilize unconventional means to complete an evaluation.[30]  The Does were aware of Ms. Kooy's request to evaluate Jane and despite this, failed to produce Jane for evaluation, saying only that they would discuss Ms. Kooy's request with Jane, but that they were "not optimistic" Jane would comply.  *R.* 1460.  Their contentions imply that it was CEHS who should have ensured Jane's availability for evaluation; however, this stance flies in the face of the statutory burden clearly placed on parents to "produce the child for the evaluation."  *See* MSER § V(1)(A)(3)(b)(ii) (removing the forty-five day deadline in cases where the "parent of a child repeatedly fails or refuses to produce the child for the evaluation").  Thus, as the hearing officer concluded, although "[t]he District has the responsibility to conduct the evaluation," it was the Does "who prevented both the evaluation and determination from occurring during the required time frame" by not making Jane available for evaluation.  *R.* 337.

Furthermore, it is clear that once the Does unilaterally placed Jane at Trails Carolina prior to the termination of the statutory period in which CEHS was obligated to evaluate Jane, they rendered Jane unavailable for testing.  While Jane was unavailable and out of the state, CEHS was under no obligation to conduct an evaluation.[31]  *See C.G.*, 2007 WL

---

[30] Despite having no duty to utilize unconventional means to assess Jane, in her email to Jane, Ms. Kooy nevertheless offered to "meet [with Jane] at a conference room located at Community Services or even [Jane's] home whatever [was] most comfortable for [Jane]."  *R.* 1456.

[31] The Hearing Officer commended the District's efforts to complete an evaluation despite the Does' lack of compliance, stating: "Here, the District exceeded its legal obligations by being willing to consider the evaluation of Dr. Daubs and Dr. Paradis without having its own evaluation completed, and hired Dr.

494994, at *29 (determining that a school district had "no obligation to send its evaluators to Utah or to contract for evaluation by Utah-based third parties; rather, the Parents' decision to remove [the student] to Utah rendered her unavailable for testing" and citing caselaw indicating that "a school district cannot be compelled to assume any responsibility for evaluating a child while [s]he remains outside [the state] in a unilateral placement."); *see also Patricia P. v. Bd. of Educ. of Oak Park*, 203 F.3d 462, 469 (7th Cir. 2000) (concluding that a mother's "lack of cooperation deprived the school district of a reasonable opportunity to conduct an evaluation of [the student] and fulfill its obligations under the IDEA" when she unilaterally removed her son from the high school, placed him in another state, and "did not send [her son] back to the school district for evaluation"). As the hearing officer concluded, the Does' unilateral action "actually blocked the District's ability to complete [Jane's] evaluation and the IEP team's ability to identify her for special education and create an IEP." *R.* 338. Instead of facilitating the school's efforts, the Does "made it their priority to place [Jane] in a hospital or residential treatment program," thereby frustrating CEHS's efforts and relieving them of the statutorily-imposed evaluation deadline.[32] *R.* 338.

---

Higbee in Utah to complete an FBA, when in fact, the District had the right under the IDEA to evaluate the Student using its own evaluators." *R.* 340.

[32] The Hearing Officer relied on the case *C.G. ex rel. A.S. v. Five Town Community School District*, and analogized the facts of the case, citing the court's reasoning: "the parents harbored a fixed purpose: to effect a residential placement for their daughter at the School District's expense, come what may" and concluded, as the C.G. court did, that the Does' actions had "disrupted the IEP process, stalling its consummation and preventing the development of a final IEP." *R.* 339 (citing *C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 288 (1st Cir. 2008)). I do not disagree with this assessment. Moreover, in light of her expertise, I defer to the Hearing Officer's assessment of the ways in which the Does hamstrung CEHS's ability to conduct an evaluation, as well as her conclusion that CEHS appropriately regarded the Daubs/Trails Carolina records as an inadequate basis upon which to formulate an IEP calling for placement in a residential program. *See* notes 12 & 13, *supra*.

### C. Notice of Procedural Safeguards

Plaintiffs' third contention is that Cape Elizabeth violated the Does' "procedural right to receive notice of the procedural safeguards, as required by the IDEA." Pl.'s Mem. 30. They assert that "at no time in the IDEA referral and evaluation process prior to June 9, 2017, did Cape Elizabeth ever provide the Does with a notice of their procedural safeguards as required by the IDEA and Maine Law." *Id.* at 30-31.

Plaintiffs' contentions on this point are contradicted by the record and the hearing officer's findings. On December 6, 2016, CEHS staff met with the Does to explain the special education referral process and obtain consent for Jane's evaluations. *R.* 949. Ms. Doe signed the consent form, which indicated that she had "received the statement of procedural safeguards attached to [the] consent form." *R.* 951. The hearing officer relied on CEHS administrators' "credible" testimony that "it was standard practice for the special education case manager" to provide copies of procedural safeguards "whenever a parent signed a consent to evaluate at each initial referral and IEP team meeting." R. 343-44. As in the due process hearing, the Does here "have the burden of proving, by a preponderance of the evidence, that they were not provided with procedural safeguards in a timely manner." I see no reason to overturn the hearing officer's finding on this point. *R.* 344.

### D. Unilateral Placement at Private School

Finally, although it is not strictly necessary to reach the issue, it is nevertheless appropriate to share a few observations concerning Plaintiff's request for relief. Under the IDEA and its Maine corollary, parents who unilaterally place their child in a private school or other therapeutic setting "without the consent of state or local school officials, do so at

their own financial risk." *Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 15 (1993). However, if a school system fails to provide a disabled child with a FAPE, "it may be obliged to subsidize the child in a private program" and would be responsible for "reasonable costs incident to that private placement." *C.G. ex rel. A.S.*, 513 F.3d at 284–85 (emphasizing the underlying goal of identifying and utilizing "the least restrictive educational environment" that will simultaneously "accommodate the child's legitimate needs").

Generally speaking, a school system will not be liable for reimbursement if the parent's actions in effectuating the unilateral placement were unreasonable. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III) (providing that "[t]he cost of reimbursement . . . may be reduced or denied . . . upon a judicial finding of unreasonableness with respect to actions taken by the parents"); *see also Patricia P.*, 203 F.3d at 468 ("[A] parent's right to seek reimbursement for a unilateral placement of their child is available only upon a finding that, after cooperating with the school district, there are 'sufficiently serious procedural failures by the school district.'") (citations and internal quotation marks omitted); *C.G. ex rel. A.S.*, 513 F.3d at 289 ("Although reimbursement of parental expenses for private residential placements sometimes is available under the IDEA, such reimbursement is contingent upon a showing that the parents diligently pursued the provision of appropriate services from the public school system, yet the school system failed to provide those services; and that the private placement is a suitable alternative.").

Here, Plaintiffs have failed to establish by a preponderance of evidence that CEHS violated any of the procedural requirements under federal and state law or that its actions

violated Jane's substantive right to a FAPE. It, therefore, goes without saying they are not entitled to the reimbursement and other relief requested in their complaint. Nevertheless, for the record, I agree with the hearing officer's assessment that, by failing to produce Jane for evaluation, then unilaterally placing Jane in two separate institutions outside of the state, and finally placing "an untenable condition upon their consent to allow [Jane] to be evaluated," *R.* 340, the Does acted unreasonably and do not qualify for reimbursement under IDEA. *Patricia P.*, 203 F.3d at 469 ("[W]e hold that parents who, because of their failure to cooperate, do not allow a school district a reasonable opportunity to evaluate their disabled child, forfeit their claim for reimbursement for a unilateral private placement."). I am, therefore, of the opinion that the Does are not entitled to the relief they seek, even if there is room in this record for reasonable minds to differ concerning the proper date on which CEHS should have made the initial IDEA special education referral.

### E. Bias

Given the tenor of the briefs, it is necessary to say a few words about adjudicator bias.[33] Plaintiffs contend the hearing officer lacked objectivity and succumbed to a conventional stereotype that children with mental health issues developed their issues because of poor parenting. Pl.'s Mem., 18-19 (ECF No. 15, #74-75). Because Jane was a proven student and her symptoms correlated so directly with what was going on in the home, the record, including some professional commentary, could suggest that the Does

---

[33] Defendants argue any allegation of bias was waived by Plaintiffs failure to allege bias in their complaint. Def. Mem. 16 n. 23 (ECF No. 19, #113). Given the standard of review, I disagree. If it were apparent that the hearing officer's decision was the product of bias, I would be able to address that concern through "involved oversight." *D.B. ex rel. Elizabeth B.*, 675 F.3d at 36.

were the kindling in this special education scenario. Additionally, the record does permit a finding that the Does circled the wagons and did not facilitate the school's special education evaluation process, both when Jane was still at CEHS and after her out-of-state placement. Based on my review of the record, however, I am not persuaded that the hearing officer's decision is the product of the "blame game," to borrow from Plaintiffs. Rather, my impression is that the hearing officer, someone familiar with the administrative demands of special education law and the pace and manner in which matters typically progress, concluded after a fulsome hearing and review of an extensive record that CEHS complied with its obligations under state and federal law. I agree with that assessment. To be sure, complying with obligations is not the same thing as exceeding obligations. Nevertheless, given CEHS's compliance, I do not see a basis in this record for the Court to dictate an alternative outcome.

## CONCLUSION

The record supports the hearing officer's thorough and thoughtful administrative decision. Judgment will therefore enter for Defendant.

**SO ORDERED.**

Dated this 29th day of April, 2019.

/S/ Lance E. Walker
**UNITED STATES DISTRICT JUDGE**